## GOVERNOR v STATE TREASURER

### Opinion of the Court

1. Schools and School Districts—Public Schools—Constitutional Law—Legislature.

Section of an article of the Michigan Constitution providing that "[t]he legislature shall maintain and support a system of free public elementary and secondary schools as defined by law" is a very simple and direct mandate to finance schools without any room or necessity for speculation as to whether "the wealth of the school district" affects "the quality of a child's education" (Const 1963, art 8. § 2).

---

* Continued from Volume 388 Michigan.

References for Points in Headnotes

[1] 47 Am Jur, Schools §§ 3, 7.
[2] 47 Am Jur, Schools §§ 83, 89.
[3, 20] 47 Am Jur, Schools §§ 2, 7, 8.
[4, 16, 26, 29] 59 Am Jur 2d, Parent and Child §§ 18, 19.
[5, 8, 9, 15, 17, 23, 24, 33, 34] 16 Am Jur 2d, Constitutional Law § 485 et seq.
[5, 6, 8] 47 Am Jur, Schools § 76 et seq.
[5–8, 12, 14, 30, 33] Validity of basing public school financing system on local property taxes. 41 ALR3d 1220.
[10, 11, 13, 23] 47 Am Jur, Schools §§ 89, 90.
[12–14, 30] 47 Am Jur, Schools § 10.
[18] 20 Am Jur 2d, Courts § 76.
[19, 28] 47 Am Jur, Schools §§ 6–8.
[21] 16 Am Jur 2d, Constitutional Law § 112.
[22] No reference.
[25] 47 Am Jur, Schools §§ 79, 80, 82, 89, et seq.
[27] 47 Am Jur, Schools §§ 1–3.
[30, 31] 16 Am Jur 2d, Constitutional Law § 250.
   47 Am Jur, Schools § 6.
[32] 16 Am Jur 2d, Constitutional Law § 3.
[35] 47 Am Jur, Schools §§ 7, 8.

2. Schools and School Districts—Public Schools—School Financing—Constitutional Law.

    The state clearly has responsibility for financing public school education in Michigan; a section of an article of the state constitution shows that Michigan through its Legislature has responsibility to "maintain and support a system of free elementary and secondary schools" (Const 1963, art 8, § 2).

3. Schools and School Districts—Public Schools—State Schools —State Agencies.

    Public schools throughout Michigan are state schools and agencies of the state.

4. Schools and School Districts—Public Education—Public Schools—School Financing—States.

    Public education is a state matter and the financing of public schools is a state responsibility.

5. Schools and School Districts—Taxation—Tax Bases.

    There is an inherent inequality in the school district property tax bases which creates unequal support for the education of Michigan children.

6. Schools and School Districts—State School Aid Formula—Tax Bases.

    The state school aid formula does not compensate for the recognized basic inequality inherent in the differences in the property tax bases of the 624 Michigan school districts.

7. Schools and School Districts—Taxation—State Aid.

    The combination of local school property taxes and state aid in fact results in inequality between a substantial majority of the school districts ranging from significant to inordinate.

8. Schools and School Districts—School Aid Formula—Tax Bases.

    The inequalities between school districts in their ability to finance an education for their school children are sufficiently common and severe to conclude that even with the equalizing efforts of the Michigan school aid formula, the inherent differences in the property tax bases of the school districts prevent equal resources for the education of Michigan school children in a substantial number of school districts.

9. CONSTITUTIONAL LAW—EQUAL PROTECTION—CLASSIFICATION—STATUTES—COMPELLING STATE INTEREST.

It is elementary that the law of equal protection involves two different tests depending upon the interest concerned; where the interest involved is an ordinary one, a court only inquires whether there is a "rational" relationship between the classification established by the statute under scrutiny and a legitimate state objective; where a fundamental interest is affected or a classification is inherently suspect, then it must appear that the classification under scrutiny is necessary for the achievement of a "compelling state interest", furthermore, it must appear that the classification is specifically fashioned to further the purpose it is designed to accomplish and the ultimate test is that the state must prove there is no less onerous alternative by which its objective may be achieved where a fundamental interest is affected or a classification is inherently suspect.

10. CONSTITUTIONAL LAW—CLASSIFICATION—SCHOOLS AND SCHOOL DISTRICTS.

In light of the people's concern and direct provision for education in the Michigan Constitution, the Michigan Supreme Court is compelled to recognize education as a fundamental interest under the Michigan Constitution requiring close scrutiny of legislative classifications concerning the distribution of educational resources.

11. CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS.

The right to an education in Michigan is a *specifically enumerated* constitutional *mandate;* education is *sui generis* and the Michigan Supreme Court has recognized its uniqueness.

12. CONSTITUTIONAL LAW—CLASSIFICATION—WEALTH.

Classification on the basis of wealth is considered "suspect" especially when applied to fundamental interests.

13. SCHOOLS AND SCHOOL DISTRICTS—TAXATION—CLASSIFICATION.

The state aid act as well as the local school district property taxes are based on the classification of the state equalized valuation per pupil in the school districts; this is therefore an educational classification *solely* on the basis of wealth per educational unit (pupils) and puts the classification in the suspect category requiring the stricter standard of scrutiny (1970 PA 100).

14. Constitutional Law—Classification—Schools and School Districts—State Equalized Value.

 The state public school financing system fails to pass the test of "rationality" where the stricter "compelling state interest" test must be applied because of the existence of a "fundamental interest and a suspect classification"; this means that the substantial inequalities in school district revenues derived from a composite system relying heavily on state equalized values per pupil is not justified by some rational relationship between the purpose of state maintenance and support of public schools and the fact that a school district happens to have more or less state equalized value per pupil within its boundaries.

15. Schools and School Districts—Constitutional Law—Equal Protection—Compelling State Interest.

 The Michigan public school financing system denies equal protection of the laws guaranteed by the Michigan Constitution when measured by both the "compelling state interest" and the "rational" classification tests (Const 1963, art 1, § 2).

16. Parties—Schools and School Districts—Parents of School Children—Declaratory Judgment—Constitutional Law—State Treasurer.

 Intervening tax-paying parents of public school children in disadvantaged school districts representing themselves and as representatives of the class of tax-paying parents of school children in disadvantaged school districts are proper plaintiffs in an action for a declaratory judgment that the then existing public school financing system is unconstitutional, as a more equalized system would favorably affect them; the named school districts being among those with higher state equalized valuation and advantaged by the present inequalities would be unfavorably affected by an equalized system as compared with the present system and the State Treasurer's concern with the distribution of state funds makes him a logical party.

17. Constitutional Law—Equal Protection—Schools and School Districts—Taxation.

 Michigan public school financing system, consisting of local, general ad valorem property taxes and state school aid appropriations, by relying on the wealth of local school districts as measured by the state equalized valuation of taxable property per student which results in substantial inequality of maintenance and support of the elementary and secondary schools, denies the equal protection of the laws guaranteed by a section

of an article of the Michigan Constitution (Const 1963, art 1, § 2).

### DISSENTING OPINION

### T. E. BRENNAN, J.

18. APPEAL AND ERROR—DISSENTING OPINION—COURTS—CONSTITUTIONAL LAW.

> *The function of a dissenting opinion is to express the writer's reasons for not joining in the majority opinion; Michigan's constitution requires Justices of the Supreme Court to give reasons for their dissenting vote.*

19. SCHOOLS AND SCHOOL DISTRICTS.

> *The Michigan Legislature does maintain and support a system of schools; the school system of Michigan is, and has always been, a system of school districts, with schools established and operating in each district.*

20. SCHOOLS AND SCHOOL DISTRICTS—STATE AGENCY—MUNICIPAL CORPORATIONS.

> *The school district is a separate state agency, not under the control of the local municipality.*

21. CONSTITUTIONAL LAW—MOOT CASE.

> *It is against every precept of good constitutional law for a supreme court to decide a constitutional question upon a moot case.*

### DISSENTING OPINION

### BLACK and T. E. BRENNAN, JJ.

22. SCHOOLS AND SCHOOL DISTRICTS—SCHOOL FINANCING—CONSTITUTIONAL LAW.

> *The Constitution of 1963 worked a radical change in the theory of school financing; for the first time, all constitutional acknowledgment of the Federal endowment for schools was eliminated and no reference was made either to the "perpetual fund" or to the later primary school interest fund.*

23. SCHOOLS AND SCHOOL DISTRICTS—SCHOOL FUNDS—CONSTITUTIONAL LAW—EQUAL PROTECTION.

> *The state purpose in the allotment of certain funds, which are distributed to the educationally needy as determined by test scores through the State Board of Education, is clear and can*

*hardly be considered a deprivation of equal protection of the laws (MCLA 388.613).*

24. Schools and School Districts—School Funds—Constitutional Law—Equal Protection.

*Other so-called categorical funds are included in the state school aid laws to assist in payment for transportation, vocational programs and the like and these appropriations are directed toward specific legislative objectives; they operate equally with respect to all districts falling within the measure of their standards, and do not deny equal protection of the laws.*

25. Schools and School Districts—School Financing—Taxation—Millage—State Equalized Value.

*Almost half of the cost of public school education in Michigan is derived from local ad valorem taxes, customarily expressed in terms of mills, a mill is 1/10 of 1% of the state equalized valuation of real and personal property; millage emanates from two sources, "non-voted" millage is annually allocated by the county allocation board or permanently allocated by vote of the people within constitutional limits of 15 and 18 mills respectively, "voted millage" is millage over and above the constitutional limitation and is levied from time to time by vote of taxpaying and non-taxpaying electors in the school district; the number of dollars per student resulting from the levy of local ad valorem taxes depends on the rate of tax (millage) and the state equalized value of taxable property in the district.*

26. Infants—Parental Rights—Parental Responsibilities—Schools and School Districts—States.

*A child is not the creature of the state; a child's first allegiance is to his family and parental rights and responsibilities in the education of children come before the state's.*

27. Schools and School Districts—Public Education.

*Public education is not government education; the two are as distinct as public opinion and government policy.*

28. Schools and School Districts—Public Schools—States.

*Public schools are surely subject to reasonable regulation by the state just as they are entitled to support and encouragement from the state; but they do not spring from the state laws nor exist to serve state policies and purposes.*

29. Schools and School Districts—Public Schools—Parental Responsibility.

*Public schools are established by the people in their local commu-*

*nities; they exist primarily to fulfill the* parental *responsibility of educating children; and it is for the people of each district to write their own definition of quality education through the implementation of such programs, the encouragement of such skills, and the exposure to such values as they deem appropriate and needful; through locally elected school officials, locally adopted taxation and locally determined school policies, the people educate their children in public schools.*

30. SCHOOLS AND SCHOOL DISTRICTS—PUBLIC SCHOOLS.

*Quality education is not a function of the wealth of a community but is a function of achieving the goals and fulfilling the educational aspirations of the people who live in the school district, and who in a collective sense, own and operate the public school.*

31. SCHOOLS AND SCHOOL DISTRICTS—TAXATION—STATES.

*Support of local schools by local taxation is a principle qualitatively different from the bare concept of local control; it is the difference between delegated, agency decision-making and proprietary interest and authority; the right of the people in a school district to operate local public schools for the purpose of fulfilling locally defined goals is the moral consequence of their own millage elections and it is not a privilege extended by sufferance of the state or delegated by reason of administrative expediency perceived by state officials.*

32. CONSTITUTIONAL LAW—SUPREME COURT.

*The duty of Justices of the Michigan Supreme Court requires obedience to the mandates of the United States Supreme Court in all matters of interpretation and application of Federal constitutional standards.*

33. SCHOOLS AND SCHOOL DISTRICTS—TAXATION.

*The Michigan Supreme Court may not assume a direct relationship between "quality" of education and tax base.*

34. SCHOOLS AND SCHOOL DISTRICTS—SCHOOL FINANCING—CONSTITUTIONAL LAW—EQUAL PROTECTION.

*The Michigan public school financing system has not been demonstrated to constitute a denial of equal protection of the laws under the state or Federal Constitutions.*

OPINION CONCURRING IN DISMISSAL

T. G. KAVANAGH, J.

35. SCHOOLS AND SCHOOL DISTRICTS—CONSTITUTIONAL LAW—LEGISLATURE.

*The Legislature is not constitutionally forbidden to ordain dispa-*

*rate educational opportunities among the state established districts.*

Certified questions from Ingham, Sam Street Hughes, J. Submitted June 6, 1972. (No. 1 June Term 1972, Docket No. 53,809.) Decided December 29, 1972. Rehearing granted January 30, 1973. Opinions vacated December 14, 1973, see 390 Mich —.

Complaint by Governor and Attorney General against State Treasurer, Bloomfield Hills School District, Dearborn City School District, and Grosse Pointe School District for a declaratory judgment that the then existing system of financing the operation of school districts is unconstitutional. Request by Governor William G. Milliken that certain questions in the case be certified to the Supreme Court as permitted by GCR 1963, 797. Leo G. Steers and others intervened as plaintiffs. Request granted and questions certified by the trial judge to the Supreme Court. Question answered favorably to plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Eugene Krasicky, Gerald F. Young, George L. McCargar,* and *Patrick Kowaleski,* Assistants Attorney General, for plaintiffs.

*Walter Shapero* and *Elwood Hain,* for Leo G. Steers, and others, intervening plaintiffs.

*Thomas C. Walsh, in propria persona,* for intervenor Thomas C. Walsh.

*John H. King, in propria persona,* for intervenor John H. King.

*Russell A. Searl* and *Robert R. Roesch,* Assist-

ants Attorney General, for defendant State Treasurer.

*Dickinson, Wright, McKean & Cudlip* (by *Charles F. Clippert* and *Charles T. Harris),* for defendant Bloomfield Hills School District.

*Butzel, Long, Gust, Klein & Van Zile* (by *William M. Saxon, Robert M. Vercruysse,* and *John B. Weaver),* for defendant Dearborn City School District.

*Hill, Lewis, Adams, Goodrich & Tait* (by *Robert B. Webster),* for defendant Grosse Pointe Public School System.

*Amicus Curiae:*

*Michael M. Glusac,* Corporation Counsel, and *Robert Reese,* Assistant Corporation Counsel, for City of Detroit.

*Ross, Bruff & Henriksen,* for Professional Personnel of Van Dyke.

*Foster, Lindemer, Swift & Collins* (by *James A. White* and *Clifford D. Weiler),* for Michigan Education Association.

WILLIAMS, J. This case will be considered in this opinion in eight parts. I, the dispositive issue. II, state control of public schools in Michigan and state responsibility for the public schools. III, the inherent inequality in school district property tax bases. IV, the school aid formula does not equalize property tax inequality. V, the inequality in the Michigan public school financing system denies equal protection of the laws. VI, limits of decision. VII, defendants' arguments. VIII, order.

I

## DISPOSITIVE ISSUE

This case concerns the constitutionality of the Michigan public school financing system.

The nature of this action is a complaint for declaratory judgment brought October 15, 1971 in the Ingham County Circuit Court by the Attorney General and the Governor to test the constitutionality of the Michigan public school financing system on the grounds of violation of the equal protection clauses of the Michigan and United States Constitutions. The State Treasurer and the Bloomfield Hills, Dearborn and Grosse Pointe school districts, all with high state equalized valuation per pupil, were named defendants.

The Governor having on December 3, 1971 addressed an Executive Message to the Supreme Court adverting to the above case or controversy as having controlling questions of public law of such public moment as to require early determination, this Court ordered the Ingham Court to certify such questions and take appropriate proofs, permitting the intervention and representation of school children in alleged economically disadvantaged districts.

Subsequently, certain tax-paying parents of public school children in disadvantaged school districts intervened as plaintiffs and as representatives of the class of tax-paying parents of school children in disadvantaged school districts.

On May 8, 1972 the circuit court filed its findings of fact.

This case is unique in this country in two respects. First, as one defendant's brief points out, "[t]he Michigan Supreme Court, however, unlike all the courts in the foregoing cases [some finding

constitutionality and some unconstitutionality] is presented with unrebutted evidence which destroys plaintiffs' assumption that the quality of a child's education is a function of the wealth of the school district in which he resides."[1] Second, as will be immediately made clear, the basis for decision in this case need not be and is not the broad philosophical questions posited in the certified questions argued by both plaintiffs and defendants here and the dispositive issue generally speaking in the other cases in this area throughout the country and referred to in the defendant's brief above.

The reason this Court need not consider the broad philosophical question posited in the certified questions is that the excellent briefs of all parties and the oral arguments make clear that the dispositive question in the case at bar depends upon the much narrower and objective question posed by the specific language of the Michigan Constitution which controls the Michigan public school financing system. Art 8, § 2 of the Michigan Constitution reads:

"The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law."

This is a very simple and direct mandate to finance schools without any room or necessity for speculation as to whether "the wealth of the school district" affects "the quality of a child's education". The only real question this provision

---

[1] The "foregoing cases" included all the leading cases on both sides of the constitutional question such as *McInnis v Shapiro,* 293 F Supp 327 (ND Ill, 1968), *aff'd sub nom McInnis v Ogilvie,* 394 US 322; 89 S Ct 1197; 22 L Ed 2d 308 (1969) (for constitutionality) and *Serrano v Priest,* 5 Cal 3d 584; 487 P2d 1241; 96 Cal Rptr 601 (1971) (against constitutionality).

leaves open is whether or not the Legislature's action maintains and supports free public schools equally or, if not equally, with valid classifications.

As a consequence, the issue in this case is posited as follows. The language of the certified question is used for almost the whole predicate but new language is substituted for the verb and object. The new language for convenience is put in capitals and the old language not used is included in brackets afterwards. This is the issue considered by this Court and is a correction of the certified question:

"Does the Michigan public school financing system, consisting of local, general ad valorem property taxes and state school aid appropriations, by relying on the wealth of local school districts as measured by the state equalized valuation of taxable property per student which results in substantial INEQUALITY OF MAINTENANCE AND SUPPORT OF THE ELEMENTARY AND SECONDARY SCHOOLS, DENY the equal protection of the laws guaranteed by Article I, Section 2 of the Michigan Constitution? [disparities of revenue produced per student, invidiously discriminate against and deny substantially equal educational opportunity to students in violation of]."

The facts in this case are not in contention and most of them are jointly stipulated to. As the quoted certified question indicates and no one denies, the Michigan public school financing system is a combined system of property taxes raised by school districts and a grant of state aid. It is incontrovertible that the differences in property tax bases create revenue inequalities among the school districts. The state aid formula from year to year has sought to equalize these inequalities and has reduced them. Substantial inequalities still remain, however. None of this is denied.

## II

## STATE CONTROL AND RESPONSIBILITY

The state clearly has responsibility for financing public school education in Michigan. The 1963 Michigan Constitution, art 8, § 2 reads:

"The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law."

Const 1963, art 8, § 2 shows that the State of Michigan through its Legislature has responsibility to "maintain and support a system of free elementary and secondary schools". This Court recognized that responsibility in *Lansing School Dist v State Board of Education,* 367 Mich 591, 595 (1962) in the following words:

"Control of our public school system is a State matter delegated and lodged in the State legislature by the Constitution. The policy of the State has been to retain control of its school system, to be administered throughout the State under State laws by local State agencies organized with plenary powers to carry out the delegated functions given it by the legislature."

Furthermore, public schools throughout the state are state schools and agencies of the state. We stated in *MacQueen v City Commission of City of Port Huron,* 194 Mich 328, 336 (1916):

"Fundamentally, provision for and control of our public school system is a State matter, delegated to and lodged in the State legislature by the Constitution in a separate article entirely distinct from that relating to local government. The general policy of the State has been to retain control of its school system, to be administered throughout the State under State laws by local State agencies organized with plenary powers indepen-

dent of the local government with which, by location and geographical boundaries, they are necessarily closely associated and to a greater or lesser extent authorized to co-operate. Education belongs to the State. It is no part of the local self-government inherent in the township or municipality except so far as the legislature may choose to make it such."

Of like import is *Child Welfare Society of Flint v Kennedy School Dist,* 220 Mich 290, 296 (1922) where this Court stated:

"The legislature has entire control over the schools of the State subject only to the provisions above referred to *[i.e.* state constitutional provisions]. The division of the territory of the State into districts, the conduct of the school, the qualifications of teachers, the subjects to be taught therein are all within its control."

And in *Collins v Detroit,* 195 Mich 333, 335–336 (1917) we emphatically stated:

"We have repeatedly held that education in this State is not a matter of local concern, but belongs to the State at large."[2]

_____

[2] There has never been any doubt in this state that education is a state responsibility. Michigan's four Constitutions clearly establish this fact. The Constitution of 1835 in Article 10, § 3, provided, in part:

"The legislature shall provide for a system of common schools * * * ."

The Constitution of 1850, Article 13, § 4, provided, in part:

"The legislature shall * * * provide for and establish a system of primary schools * * * ." Section 1 of the same Article provided, " * * * the superintendent of public instruction shall have the general supervision of public instruction * * * ."

In interpereting the above education provisions of the Constitution of 1850, the Michigan Supreme Court stated,

"The school district is a State agency. Moreover, it is of legislative creation." *Attorney General v Lowrey,* 131 Mich 639, 644 (1902).

Again, interpreting the Constitution of 1850, the Supreme Court of Michigan in *Attorney General v Detroit Board of Education,* 154 Mich 584, 590 (1908), adopted lower court language which read:

" 'Education in Michigan belongs to the State. It is no part of the local self-government inherent in the township or municipality, ex-

In short, public education is a state matter and the financing of public schools is a state responsibility.

## III

## INHERENT INEQUALITY IN SCHOOL DISTRICT PROPERTY TAX BASES

There is an inherent inequality· in the school district property tax bases which creates unequal support for the education of Michigan children. The inequality has been recognized in legislation for years. Just a few paragraphs will substantiate these conclusions.

---

cept so far as the legislature may choose to make it such. The Constitution has turned the whole subject over to the legislature.' "

The Constitution of 1908 in Article 11, § 2, provided that the Superintendent of Public Instruction "shall have general supervision of public instruction in the state." Article 11, § 9, provided, in part as follows:

"The legislature shall continue a system of primary schools, whereby every school district in the state shall provide for the education of pupils without charge for tuition * * * ."

This provision was construed in *Child Welfare Society of Flint, MacQueen* and *Collins, supra.* For similar interpretations of this provision and pronouncements on this state function generally, see also *Attorney General v Thompson,* 168 Mich 511 (1912); *Van Fleet v Oltman,* 244 Mich 241 (1928); *Public Schools of Battle Creek v Kennedy,* 245 Mich 585 (1929); *In re School Dist No 6, Paris and Wyoming Twps,* 284 Mich 132 (1938); *Detroit Board of Education v Superintendent of Public Instruction,* 319 Mich 436 (1947); *Ira School Dist No 1 Fractional v Chesterfield School Dist No 2 Fractional,* 340 Mich 678 (1954); *Jones v Grand Ledge Public Schools,* 349 Mich 1 (1957); *Imlay Twp School Dist v State Board of Education,* 359 Mich 478 (1960).

The Constitution of 1963, the present Constitution of the State of Michigan, in Article 8 § 2, provides, in part, as follows:

"The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law."

This Court construed that section to mean:

"It is the responsibility of the State board of education to supervise the system of free public schools set up by the legislature and, as a part of that responsibility, to promulgate regulations specifying the number of hours necessary to constitute a school day for elementary

A

The trial court made the following finding:

"SEV [State Equalized Value] per child is the measure of the wealth of the school district. It ranges from a low of $2,165.00 of taxable property in the poorest district in Michigan to $405,747.00 in the wealthiest district." Circuit Court Findings of Fact and Certification, II, C, 1 (d).

If the average millage levy of 25 mills in the 1970–1971 school year (Finding of Fact, II, B, 5) is applied to the respective SEV's of the poorest and the wealthiest school districts, as indicated above, the result is $54.13 per pupil for the poorest and about $10,125 for the richest. This means that with the school district property tax alone the richest district has almost 200 times the ability of the poorest school district to support its school children. This certainly is extreme inequality.

B

Subsection A indicates the extreme inequality between the poorest and richest school districts as

---

school students as well as for other classifications or groupings of students, to determine the curricula and, in general, to exercise leadership and supervision over the public school system." *Welling v Livonia Board of Education,* 382 Mich 620, 624 (1969).

As stated by Justice ADAMS dissenting in *Advisory Opinion re Constitutionality of PA 1970, No 100,* 384 Mich 82, 106 (1970):

"Free public education for all is a responsibility of the state. It is state business."

See also *OAG, 1963–1964, No 4,376, p 484 (October 16, 1964).*

This exact question was recently decided adverse to the defendant school districts by the Sixth Circuit in *Bradley v Milliken,* 468 F2d 902 (CA 6, 1972) which went into great detail to show numerous examples of state control over local public education in Michigan.

far as the property tax base is concerned, but
inequality cuts deep. Below is a table developed
from the data in the Findings of Fact and Certifi-
cation, III and Plaintiffs' Exhibit 10a:

| #School Districts | SEV Per Pupil | % of Pupils | Average Millage | Property Tax Revenues Per Pupil |
|---|---|---|---|---|
| 48 | $32,000 up | 3.1% | 25 | $800 |
| 32 | 8,000 down | 2.1% | 25 | $200 |
| 99 | 24,000 up | 12.7% | 25 | $600 |
| 102 | 10,000 down | 9.2% | 25 | $250 |
| 196 | 18,000 up | 48.1% | 25 | $450 |
| 194 | 12,000 down | 19.1% | 25 | $300 |

Review of this table reveals that among approxi-
mately one-eighth of Michigan School districts, the
48 richest districts had at least 4 times or more
the property tax ability to support their students
as 32 of the poorest districts. Such review further
reveals that among approximately one-third of
Michigan school districts, 99 richer districts had at
least 2-1/4 times the property tax power as 102
poorer districts. Such review finally reveals that
among approximately two-thirds of Michigan
school districts serving about two-thirds of Michi-
gan school children the property tax power favors
the richer half of the districts by a ratio of at least
three to two.

In short, whether the inequality of the property
tax base is considered between the two extremes of
rich and poor school districts or between the great
bulk of the school districts, there exists a more
than substantial inequality.

## C

The existence of this inequality is officially rec-
ognized by Michigan government, because the

school aid formula contains a provision to try to compensate for this inequality.[3]

## IV

## STATE SCHOOL AID DOES NOT EQUALIZE PROPERTY TAX INEQUALITY

The state school aid formula does not compensate for the recognized basic inequality inherent in the differences in the property tax bases of the 624 Michigan school districts.

## A—AUTHORITIES

To begin with, the circuit court in its Findings of Fact and Certification stated (I, C, 1 [d]):

*"The deductible millage formula does in fact go part way in equalizing the school fund* available to Michigan youngsters by dispersing more funds to the 'poor' districts and relatively less to the 'wealthy' districts." (Emphasis added.)

The trial court in this finding clearly indicates that the state aid formula *does not go the whole way in equalizing* the school fund available to Michigan youngsters.

A similar conclusion was reached in the authoritative "Thomas Report."[4] (Findings of Fact and Certification, V, 1.) The Thomas Report stated:

---

[3] Findings of Fact and Certification, II, C, I (d):

"(d) The formula for 1970–71 is as follows:

| SEV BEHIND EACH CHILD | GROSS ALLOWANCE | DEDUCTIBLE MILLAGE |
|---|---|---|
| (a) $15,500.00 or more | $530.50 | 14 mills |
| (b) Less than $15,500.00 | $623.50 | 20 mills |

The net per pupil State Aid payment to each district is calculated by subtracting from the gross allowance an amount found by multiplying the deductible millage factor by that District's SEV per child."

[4] J. Thomas, School Finance and Educational Opportunity in Michigan.

" 'It is easy to document financial inequalities among school districts in Michigan. In general, districts with a relatively high state equalized value per pupil tend to spend more money on the education of each child and have a lower tax rate.' " Quoted in Findings of Fact and Certification, V, 7.

## B—SPECIAL EXAMPLES OF INEQUALITY

A table included in the Circuit Court Findings of Fact and Certification, IV, 2 permits drawing one's own conclusions. The pertinent part of that section reads as follows:

"2. For the 1970–71 fiscal year, among 527 K–12 school districts, the high, median and low school districts, ranked by current operating expenditures per pupil were as follows:

|  | Current Operating Expenditure per pupil | SEV Per Pupil |
|---|---|---|
| Oak Park | $1,427.00 | $36,907.00 |
| Littlefield | $  710.00 | $12,963.00 |
| Ionia | $  541.00 | $ 8,428.00" |

The first observation one must make is that the current operating expenditure per pupil in the high district, Oak Park, is twice as high as that for the median district, Littlefield, and not quite three times as high as that for the low district, Ionia.

The second observation is that, while the table shows no millage rate for the three districts, if the low district had levied 50 more mills which it obviously could not legally have done and stayed within the 50-mill limitation of Const 1963, art 9, § 6, it could only have added $421.40 to its $541 current operating expenditure per pupil. In other words through the exercise of local option the school district electors of Ionia could in no legal way give their school children the same educational resources as enjoyed by the school children of the Oak Park District. Indeed it would cost

Ionia more than 20 mills to catch up to the median Littlefield, and that would tend to bring it near its millage limit.

While it is astounding enough that the low district Ionia cannot by taxing itself to its legal limit ever invest in its children the same resources as Oak Park, the high district, it is altogether astonishing that Littlefield, the median district, also cannot by taxing itself to.its legal limit equal the Oak Park investment in its children.

Perhaps of more direct interest to this case is that if defendant Dearborn school district's neighbors, Dearborn Heights and Inkster doubled their millage which would put them above the legal 50-mill limitation, they would both still be $300 short of Dearborn's existing combined revenue per pupil levying less than 26 mills.[5] Likewise if Grosse Pointe's neighbor the Wayne Community School District raised its 35.89 operating millage rate by 15 mills, which would put it over the 50-mill limitation, it could not equal Grosse Pointe's combined revenue per pupil levying less than 32 mills.[6] The same process can be applied to Madison Heights vis-a-vis Bloomfield Hills with the same result.[7]

| [5] School District | SEV per pupil | Millage | Local Revenue per pupil | State Grant per pupil | Total St. Revenue per pupil |
|---|---|---|---|---|---|
| Dearborn | $43,019 | 25.90 | 1219.38 | 106.43 | 1325.81 |
| Dearborn Hts | 8,200 | 27.90 | 275.64 | 474.69 | 750.33 |
| Inkster | 8,140 | 25.90 | 219.21 | 526.36 | 745.57 |

Source Plaintiffs' Exhibit 49.

| [6] School District | SEV | Millage | Local Revenue per pupil | State Grant per pupil | Total St. Revenue per pupil |
|---|---|---|---|---|---|
| Grosse Pte. | $30,744 | 31.30 | 1,042.32 | 151.36 | 1193.68 |
| Wayne Comm. | 13,064 | 35.89 | 503.74 | 401.46 | 905.20 |

Source Plaintiffs' Exhibit 49.

| [7] School District | SEV | Millage | Local Revenue per pupil | State Grant per pupil | Total St. Revenue per pupil |
|---|---|---|---|---|---|
| Bloomfield Hills | $27,429 | 31.63 | 959.85 | 238.75 | 1198.60 |
| Madison Heights | 10,224 | 31.63 | 358.19 | 445.91 | 804.10 |

Source Plaintiffs' Exhibit 49.

## C—OVERALL INEQUALITIES

Only about one-third of the state's school districts receive nearly equal total revenues from combined state and local school property taxes. The other two-thirds receive unequal total revenues ranging from a disparity of 6.5% to 1425.0%. This is what the data introduced in evidence shows.

The conclusion is inescapable that the combination of local school property taxes and state aid in fact results in inequality between a substantial majority of the school districts ranging from significant to inordinate. While the worst extremes in total revenues to school districts affect only about 5% of the school population, up to 67% of the school population is adversely affected in a significant manner.

The following table constructed from the data in Circuit Court Findings of Fact and Certification, III is the principal basis for the preceding and subsequent observations:

| School Districts | SEV per pupil | Operating Millage | Property Tax Revenues per pupil | State Aid per pupil | Combined Revenue per pupil |
|---|---|---|---|---|---|
| 48 | $32,000 up | 25 | $800 | $ 82.50 | $882.50 |
| 32 | 8,000 down | 25 | 200 | 463.50 | 663.50 |
| | | | | | −219.00 |
| 99 | 24,000 up | 25 | 600 | 194.50 | 794.50 |
| 102 | 10,000 down | 25 | 250 | 423.50 | 673.50 |
| | | | | | −$121.00 |
| 196 | 18,000 up | 25 | 450 | 278.50 | 728.50 |
| 194 | 12,000 down | 25 | 300 | 383.50 | 683.50 |
| | | | | | −$ 45.00 |

It should be emphasized that the above table *does not* indicate maximum possible disparity, nor does it indicate even *average* disparity between school districts. Rather, it indicates *minimum* dis-

parity between the categories of school districts represented.

If in the top two lines of the table, for example, instead of showing the minimum disparity, that is, the difference at $32,000 and $8,000 SEV per pupil; the maximum disparity were shown, that would contrast $405,747 per pupil and $8,000 per pupil with the difference in combined revenues being over $9,000 rather than $219.

Again comparing the top two lines, for example, and instead of showing the minimum disparity, if the average disparity were shown the following table constructed from Trial Exhibit J-A would tell the story:

| #School Districts | Average SEV per pupil | Operating Millage | Average Property Rev per pupil | State Aid[8] per pupil | Combined Rev per pupil |
|---|---|---|---|---|---|
| 48 | $44,719 | 25 | $1,197.00 | $ 0 | $1,197.00 |
| 28 | 6,468 | 25 | 161.70 | 494.14 | 655.84 |
| | | | | | $ -541.16 |

The second and third categories likewise compose only the bottom of the top and the top of the bottom. Since the second and third categories include all the school districts in the preceding categories the range is very extensive.

Thus, considering the table and data in the Circuit Court Findings of Fact and Certification as indicated in the table first constructed above it must be remembered that we are considering *minimum* disparity. This table indicates on its face that in 80 school districts, even the highest of the 32 poorer ones would require a minimum $219, or

[8] The state aid per pupil listed above in the recomputed table from Exhibit J-A understates the aid given to the "high" SEV districts because the aid is computed here at the average SEV per pupil of $44,719 which produces zero state aid for everyone. In fact, many districts receive at least some state aid which, when spread over the class of students would produce additional disparity. The figures are not the average state aid per pupil but the state aid per pupil considering all pupils as having the same average SEV per pupil.

roughly 1/3 more revenue to equal the combined property tax revenues and state school aid of the richer 48; that in 201 school districts even the highest of the 102 "poorer" ones would require a minimum $121, or roughly 18% more, to equal the combined tax revenues and aid of the richer 99, and that in 390 school districts even the highest of the poorer half would require a minimum $45 or about 6.5% more to equal the tax and aid received by the richer half.

By computation it can be further derived that the lower 32 school districts in the aforementioned 80 could not by adding 27 mills of taxes and exceeding their 50-mill limitation equal the combined tax and aid receipts of the top 48.

Using the actual average figures computed from Exhibit J-A, in order for the combined property tax and school aid revenue of the 28 poorest school districts to be equal to the combined revenues of the richest districts taxing themselves at 25 mills, the "poor" districts would have to tax themselves at about 109 mills, which happens to be more than double the constitutional limit of what they can tax themselves under any circumstances.[9]

Likewise in the next group of 390 it would require the "richest" of the lower group of 194 to levy a minimum of 3.75 additional mills to equal the combined tax and aid receipt of the "poorer" of the upper 196.

It has been suggested that these wide differences are rationally attributable to differences in the cost of education and the nature of education in different regions of the state. Nothing could be

| [9] #School Districts | Average SEV per pupil | Millage | Property Tax Revenues per pupil | State Aid per pupil | Combined Revenue per pupil |
|---|---|---|---|---|---|
| 48 | $44,719 | 25 | $1,197.00 | $0 (see fn 8) | $1,197.00 |
| 28 | 6,468 | 109 | 705.01 | $494.14 | 1,199.15 |

further from the truth. If there were a rational relationship between the combined state and local financing formulas and the costs of education in different parts of the state then you would expect to see regional relationships of near equality where costs are nearly equal. Other parts of this opinion show that the argument is specious. See for example the great disparities between Dearborn and Dearborn Heights discussed *supra* at footnote 5 and accompanying text. But the difference between Dearborn and Dearborn Heights is not an isolated regional difference. Exhibit J-A shows that in 1970–1971 there were 37 school districts in Wayne County. Fifteen of these school districts had SEV's per student below $18,000 per student. Eight of these school districts had SEV's per student of $32,000 or better including Dearborn City, Hamtramck, River Rouge, Fairlane Schools, Ecorse, Harper Woods, Woodhaven and Riverview. Five school districts had SEV's per student between $24,000 and $32,000 including Grosse Pointe, Highland Park, Plymouth, South Redford and Trenton. Nine others had SEV's per student between $18,000 and $24,000 including Detroit City School District, Melvindale, Livonia, Romulus, Wyandotte, Gibraltar, Grosse Ile, Northville and Van Buren.

Similar disparities exist in virtually every county throughout the state as revealed by Plaintiff's Exhibit J-A.

In conclusion, the inequalities between school districts in their ability to finance an education for their school children are sufficiently common and severe to conclude that even with the equalizing efforts of the Michigan school aid formula, the inherent differences in the property tax bases of the school districts prevent equal resources for the

education of Michigan school children in a substantial number of school districts.

## V

## "EQUAL PROTECTION"

The heart of this case is to confront the law of "equal protection" with the reality of the inequality inherent in the Michigan public school financing system.

It is elementary that the law of equal protection involves two different tests depending upon the interest concerned. Where the interest involved is an ordinary one, a court only inquires whether there is a "rational" relationship between the classification established by the statute under scrutiny and a legitimate state objective. Where a fundamental interest is affected or a classification is inherently suspect, then it must appear that the classification under scrutiny is necessary for the achievement of a "compelling state interest". Furthermore, it must appear that the classification is specifically fashioned to further the purpose it is designed to accomplish. See, *e.g., Wilkins v Ann Arbor City Clerk,* 385 Mich 670, 679–680 (1971); Comment, *Educational Financing, Equal Protection of the Laws, and the Supreme Court,* 70 Mich L Rev 1324, 1330 (1972). And very importantly there is an ultimate test. The state must prove there is no less onerous alternative by which its objective may be achieved. *Wilkins,* 685 ff.

## A—EDUCATION IN MICHIGAN A FUNDAMENTAL INTEREST

The fundamental interest of the people in Michigan in education is expressed in our history and in

our constitutions, as my Brother T. E. BRENNAN has so excellently described. The 1963 Michigan Constitution establishes the people's fundamental interest in education in a number of ways, but significantly in that it devotes an entire article to education, Article 8.

Art 8, § 1 proclaims Michigan's dedication to education by reiterating the words used in the great Northwest Ordinance of 1787:

"Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."

The high value placed on this section is evident from the constitutional debates. 1 Official Record, Constitutional Convention 1961, pp 197–207; 762–763; 1188–1199; 2 Official Record, Constitutional Convention 1961, pp 2554–2560.

The people of Michigan backed up this ringing proclamation of faith and purpose by a specific and pragmatic directive to the Legislature. Const 1963, art 8, § 2 reads in part:

"The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law."

The people then in Const 1963, art 8, § 3 set up a State Board of Education to exercise "[l]eadership and supervision over all public education." The history of these constitutional provisions is well discussed by my Brother T. E. BRENNAN. While it may be true that the specific obligation of the compact regarding a designated area of a township is only an "honorary" obligation, it does not follow that the obligation to provide for a system of schools is "honorary". But whether the

obligation is obligatory or honorary is not the point here. The mere inclusion of provisions to ensure the carrying on of public education suggests the importance of education in Michigan. Other factors suggesting the importance of education are the compulsory attendance laws, in effect since at least 1895 PA 95, criminal penalties for parents who fail to send their children to school (MCLA 340.740; MSA 15.3740), and children who repeatedly absent themselves from school are subject to the jurisdiction of the probate court and themselves face a possible loss of liberty (MCLA 712A.1 *et seq.;* MSA 27.3178 [598.1] *et seq.).*

In the drafting of our Constitution of 1963 as well as previous constitutions, we have treated education as a key attribute of governmental responsibility. The majority of articles in the constitution are devoted to the operation of general government. Art 8, "Education" along with art 2, on elections, are two of the few articles dealing with a single subject of government-citizen relationships. This Court has recognized the right to vote as a fundamental interest. *Wilkins, supra.* In light of the people's concern and direct provision for education in the constitution, this Court is compelled to recognize education as a fundamental interest under the Michigan Constitution requiring close scrutiny of legislative classifications concerning the distribution of educational resources.

This Court strongly aligns itself with the eloquent statement of the United States Supreme Court on the basic importance of education as expressed in *Brown v Board of Education,* 347 US 483, 493; 74 S Ct 686; 98 L Ed 873 (1954):

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for

education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

In passing, for those who fear recognizing education as a fundamental interest because it can open a Pandora's box of other functions as fundamental interests, there are at least two important observations. The right to an education in Michigan is a *specifically enumerated* constitutional *mandate.* Second, education is *sui generis* and this Court has recognized its uniqueness. In *Lansing School Dist v State Board of Education,* 367 Mich 591, 595 (1962) we said:

"Unlike the delegation of other powers by the legislature to local governments, education is not inherently part of local self-government of a municipality except insofar as the legislature may choose to make it such. Control of our public school system is a State matter delegated and lodged in the State legislature by the Constitution."

## B—WEALTH, A SUSPECT CLASSIFICATION INVOLVED

Classification on the basis of wealth is considered "suspect" especially when applied to fundamental interests. *Harper v Virginia Board of Elections,* 383 US 663, 668, 670; 86 S Ct 1079; 16 L Ed 2d 169 (1966); *McDonald v Board of Election Com-*

*missioners of Chicago,* 394 US 802, 807; 89 S Ct
1404; 22 L Ed 2d 739 (1969); *Serrano v Priest,* 5
Cal 3d 584, 602–605; 487 P2d 1241; 96 Cal Rptr
601 (1971); *Van Dusartz v Hatfield,* 334 F Supp
870 (D Minn, 1971).

1970 PA 100, § 8a(2) provides for basic allotment
as follows:

"(2) The sum allocated to each school district shall be
computed from the following table:

| "State equalized valuation behind each child | Gross Allowance | Deductible Millage |
|---|---|---|
| a) $15,500.00 or more | $530.50 | 14 |
| b) Less than $15,500.00 | $623.50 | 20" |

Section 8b also speaks in terms of state equalized
valuation and millage.

The above references to 1970 PA 100 indicate
clearly that the state aid act as well as the local
school district property taxes are based on the
classification of the state equalized valuation per
pupil in the school districts. This is therefore an
educational classification *solely* on the basis of
wealth per educational unit (pupils) and puts the
classification in the suspect category requiring the
stricter standard of scrutiny.

We are not concerned here with the distribution
of resources on the basis of need or other classifica-
tions as provided in other parts of the school aid
act. If the § 8(a) formula cannot stand by itself
because of an impermissible classification then it is
no better because some *other* funds are distributed
by a permissible classification.

## C—"COMPELLING STATE INTEREST"

There can be no "compelling state interest"
claimed for the classifications based on wealth

resulting in the inequalities connected with the distribution of public school funds pursuant to the mandate of Const 1963, art 8, § 2 other than local control.

Local control is the interest asserted by defendants as justification for the district wealth classification under either constitutional test:

"The present Michigan school financing scheme has a rational basis in that it assures.that citizens in local districts will have the opportunity to help design their children's education."

* * *

"[E]ven if this Court adopts the more stringent compelling interest test, this Court should find that there is a compelling governmental interest in allowing a parent to have an effective voice in designing his child's education. Under either test the present financing system which assures local control of schools ought to be held to be constitutional." Brief of Defendant, Dearborn City School District, 38–39.

"Local control" must be further clarified. The only elements of "local control" asserted in justification is the authority to approve additional millage. Such other elements of "local control" granted by the Legislature derive from the right to elect school board members who in turn exercise control subject to the "leadership and supervision" of the State Board of Education. Const 1963, art 8, § 3.

Assuming for the moment that the Michigan public school finance system as a whole is properly fashioned to further the general purpose it was designed to accomplish, there remains the question of whether the state interest in local control may be served by a less onerous alternative than measuring the amount of local control in terms of raising local revenues based on the value of prop-

erty per student in a school district. The burden is here upon those defending the classification once its unequal results are shown. There was no such effort made, but it is clear from the admitted progressively more "equalized" public school finance laws year by year (including those after 1970 PA 100), that greater equality can be achieved. Greater equality is clearly potentially available on the one hand through perfecting the deductible millage formula and on the other hand through the reformation of the taxing and expenditure boundaries of school districts. There may be other ways as well.

## D—RATIONAL TEST

While the stricter "compelling state interest" test must be applied because of the existence of a "fundamental interest and a suspect classification", the state public school financing system also fails to pass the test of "rationality". This means that the substantial inequalities in school district revenues derived from a composite system relying heavily on state equalized values per pupil is not justified by some rational relationship between the purpose of state maintenance and support of public schools and the fact that a school district happens to have more or less state equalized value per pupil within its boundaries.

This Court sees no logical connection between the asserted justification of "local control" and the amount of school funds the state distributes to or permits to be expended in a school district based *solely* on the fortuitous circumstance that the district has more or less valuable properties per pupil within its borders. While not directly in point, it is interesting to note again that defendants themselves make a similar argument on the

basis of the scientific evidence produced in this
case that there is no validity in the "assumption
that the quality of a child's education is a function
of the wealth of the school district in which he
resides."[10] If there is no relationship how can there
be a claimed rational basis?

Going outside of the internal logic of a reasona-
ble connection between the state distribution of
funds to schools and the value of property in
school districts, the argument is made that such a
connection is justified because the right of the
local school district to levy increased millage gives
it the power to control the character of its schools'
education. There is an anomaly in this justification
because of defendants' position, that there is *no*
proven connection between higher school revenues
and improved education. Nonetheless the argu-
ment of "local control" needs to be considered. It is
an inviting argument on the surface but it be-
comes illusory when examined in depth.

In the first place such local control as there is
over education in the school district exists because
of the right to elect local school boards which
control local school policy subject to the "leader-
ship and supervision" of the State Board of Educa-
tion. These rights are completely unrelated to the
financing scheme at issue here.

Second, recognizing that by "local control" may
be meant the option to levy additional taxes for
specially desired educational services, the validity
of that argument must be met head-on. That just
is not what the option is.

To begin with the school property tax is not a
pleasure horse to ride into greener pastures, it is
the work horse to cover the everyday rocky road of

---

[10] Quotation is from a defendant's brief and repeated from p 11. See
also footnote 1.

school finance. School district property taxes are the largest element in the combined state public school financing system. Circuit Court Findings of Fact and Certification.

In addition this so-called option is not really an option at all for the poorer (per pupil) school districts. Because of the 50-mill tax limitation of Const 1963, art 9, § 6, and the low revenue per added mill levied, the greener pastures of the richer school districts can remain an ever receding mirage for the school district with low state equalized value per pupil.

To sum it all up there is no internal rationality between state distribution of funds to school districts on the basis of SEV per pupil and grossly disparate state equalized value *per pupil* of school districts. Furthermore, the seemingly plausible argument of local control to permit school districts to opt for the greener pastures of education is really a heavy yoke for all school districts to bear and adds up to the major share of the state's burden to "maintain and support" free public schools. For the poorer school districts it is a hoax that they can follow the richer school districts into the green pastures. All in all, this Court finds no rationality justifying the substantial inequalities found.


## E—DENIAL OF EQUAL PROTECTION

This opinion for the reasons stated in A, B, C and D holds that in certain particulars, the Michigan public school financing system denies equal protection of the laws guaranteed by art 1, § 2 of the Michigan Constitution when measured by both the "compelling state interest" and the "rational" classification tests.

VI

## LIMITS OF DECISION

The state public school financing system is obviously a very complicated one. While the certified questions to this Court are very broad, no one should imagine that the questions can be presumed to call all provisions of the several statutes included in the financing system into question.

The ruling in this opinion, for example, should not be misinterpreted to require absolute equality in the distribution of state educational resources in all cases with no recognition of reasonable classifications.

Furthermore, this opinion does not relate to "local control". This opinion relates only to the state's obligation "to maintain and support" public schools *financially* under Const 1963, art 8, § 2.

As already indicated "local control" is largely exercised through the local school board, which sets local school policy and hires and supervises local school personnel. The people of the local school district in turn exercise their control through electing and watching over the local school board. The people also elect the State Board of Education that under Const 1963, art 8, § 3 is granted "leadership and supervision" of the public schools. It is common knowledge that the State Board of Education has traditionally left the local school boards with wide discretion to manage their own affairs. In any event, none of the matters relating to the exercise of local control is in question in this opinion.

VII

## DEFENDANTS' ARGUMENTS

Defendants raised four points that should be considered:

A. There is no actual case or controversy.

B. The Supreme Court of the United States has spoken and that controls this case.

C. Knowledge about educational finance and its inter-relationships with the forces at work within the educational system has not advanced to the point that constitutional determinations are proper.

D. The present Michigan public school finance system achieves adequate equality and is rational —education is not a fundamental interest and the rational basis, not the compelling state interest test should be used.

## A—CASE OR CONTROVERSY

Without addressing the contentions that the Attorney General and Governor are not empowered to maintain this suit on behalf of the people, the intervening tax-paying parents of public school children in disadvantaged school districts representing themselves and as representatives of the class of tax-paying parents of school children in disadvantaged school districts are proper plaintiffs, as a more equalized system would favorably affect them. *Bond v Ann Arbor School Dist,* 383 Mich 693 (1970). The named school districts being among those with higher state equalized valuation and advantaged by the present inequalities would be unfavorably affected by an equalized system as compared with the present system. The State Treasurer's concern with the distribution of state funds makes him a logical party.

## B—UNITED STATES SUPREME COURT PRECEDENT

Defendants urge that this case is controlled by

two Federal three-judge cases affirmed by the
United States Supreme Court without opinion.
*McInnis v Shapiro,* 293 F Supp 327 (ND Ill, 1968),
*aff'd sub nom McInnis v Ogilvie,* 394 US 322; 89 S
Ct 1197; 22 L Ed 2d 308 (1969); *Burruss v Wilker-
son,* 310 F Supp 572 (WD Va, 1969), *aff'd* 397 US
44; 90 S Ct 812; 25 L Ed 2d 37 (1970).

Leaving aside the precedential authority of a
United States Supreme Court case in that form, it
is to be noted that that Court has assumed juris-
diction in a similar and subsequent case, *Rodri-
guez v San Antonio Independent School Dist,* 337
F Supp 280 (WD Tex, 1971), appeal docketed 40
LW 3513 (US April 25, 1972) No. 71-1332.

*McInnis* and *Burruss* are distinguishable from
the case at bar in any event. In neither *McInnis*
nor *Burruss* is there an indication that the school
system as in Michigan is a state controlled system.
In neither case is there a constitutional provision
that the Legislature shall "maintain and *support"*
a free public school system. The Illinois Constitu-
tion requires the Legislature to "provide a thor-
ough and efficient system of free schools" and the
Virginia Constitution requires the Legislature to
"establish and maintain an efficient system of free
schools." In *McInnis* the Court decided that equal
protection does not require public school expendi-
tures to "be made only on the basis of pupils'
educational needs," a question neither argued nor
forming a basis of decision here. In *Burruss* the
plaintiffs complained about "substantial dispara-
ties in the educational opportunities," "educa-
tional needs" and differences in costs, none of
which appear in the issue in this case as amended.

## C—INSUFFICIENT DATA TO THE
## EDUCATIONAL FINANCE & PUPIL
## ACHIEVEMENT

In the very excellent briefs of defendants they

persuasively produced data from the Michigan Department of Education's Educational Assessment Program relative to the lack of direct relationship of school district wealth to educational achievement. As indicated at the outset, this opinion concurs in that finding. Because of that finding and the fact that the constitutional situation made the original certified question too broad, the statement of the issue was changed to meet the reality of the law and the facts. As a consequence, this argument of defendants is no longer apropos.

### D—PRESENT PUBLIC SCHOOL FINANCE SYSTEM "EQUAL" & "RATIONAL"

This point, of course, is the major issue addressed in the body of the opinion which reaches a different conclusion.

### VIII

In conclusion, the answer to the certified question as amended:

"Does the Michigan public school financing system, consisting of local, general ad valorem property taxes and state school aid appropriations, by relying on the wealth of local school districts as measured by the state equalized valuation of taxable property per student which results in substantial inequality of maintenance and support of the elementary and secondary schools, deny the equal protection of the laws guaranteed by Article I, Section 2 of the Michigan Constitution?"

is "Yes." The Michigan public school financing system in the way it responds to the Michigan Constitution of 1963, art 8, § 2 mandate to "maintain and support" the Michigan public school sys-

tem denies equal protection of the laws guaranteed by art 1, § 2 of the Michigan Constitution. Since this interpretation of art 8, § 2 and art 1, § 2 of the Michigan Constitution is dispositive of this case, the related Federal question is not considered.

Because these are class actions, because of the great impact on school operations, because of the long lead time in tax and allocation functions and because of the complicated structure of school financing, the formulation of an order in these cases presents problems of considerable complexity.

We have now held that the basic allocation of funds provided for in the public school financing system as it existed at the commencement of this suit denies the equal protection of the laws. However, since that time a wholly new and different allocation formula is on the books, 1972 PA 258. Whether the public school financing system with this as a component still denies equal protection of the laws has not been and is not before us.

While there is no fair or effective way of testing and enforcing our decision with respect to the present school district taxes just levied on the school aid formula already authorized, this Court will stand ready upon adoption of a new school aid formula and before levy of school taxes to entertain, if that is in order, a petition to test the new combined public school financing system, and, if appropriate, fashion suitable orders.

T. M. KAVANAGH, C. J., and ADAMS and SWAINSON, JJ., concurred with WILLIAMS, J.

T. E. BRENNAN, J. *(addendum).* Since the opinion which follows carries only two signatures, it constitutes a minority opinion. It is appended purely for the information of the profession and the public.

Unfortunately, my opinion was not written as a dissenting opinion. The function of a dissenting opinion is to express the writer's reasons for not joining in the majority opinion. Our constitution requires Justices of this Court to give reasons for their dissenting vote.

This cause was argued in our Court on June 6, 1972. By process of blind rotation, I was assigned to prepare an opinion for the Court.

I did so with reasonable dispatch. My opinion was circulated to the other members of the Court on July 27, 1972.

The opinion of Justice THOMAS G. KAVANAGH, concurring in dismissal, was served on November 22, 1972.

It was not until December 12, 1972, just two weeks ago, that Justice G. MENNEN WILLIAMS served the first draft of his opinion on the members of the Court.

That opinion came to us in "discussion draft" form. Only one meeting of the Court remained before year's end—December 21. The "Discussion Draft" was not eligible for decision on that date.

On December 26, I was advised by the Chief Justice that four members of the Court were prepared to sign and publish the WILLIAMS "Discussion Draft" as the final opinion of the Court.

All of which leaves very little time for detailed analysis or criticism of what will become the majority opinion.

But I am told that speed is now essential. Time is of the essence. The same Justices who purposefully permitted this case to hang fire for five months with my completed opinion, unanswered, on their desks, have now decided that time is of the essence.

It is, of course, true that one member of their

majority is leaving in a few days. That could account for the hurry.

Nonetheless, they have the votes. In this Supreme Court, four votes seems to be the name of the game.

So the long awaited opinion in the school case comes down, and I must perforce give my reasons for dissenting as succinctly as possible.

The majority opinion attempts to leap from the general proposition that the Legislature has the duty to maintain and support a *system* of * * * schools, to the specific proposition that the Legislature has a duty to maintain and support the *schools* themselves.

The Legislature does maintain and support a *system* of schools. That *system* is a *system* of local schools, operated by local school districts.

The opinion of Justice COOLEY in *Stuart v Kalamazoo School Dist,* 30 Mich 69 (1874) contains a detailed and illuminating perspective on Michigan educational history and policy. It traces the creation of common schools in the state to the territorial days, and makes abundantly clear that the *school system of Michigan is, and has always been, a system of school districts, with schools established and operating in each district.*

This was and is the *system* which our forebears intended:

"[T]o fit the children of the poor as well as the rich for the highest spheres of activity and influence." *Stuart v Kalamazoo School Dist, supra,* p 81.

The majority opinion's quote from *Lansing School Dist v State Board of Education,* 367 Mich 591, 595 (1962) is lifted out of context.

The full paragraph reads as follows:

"Unlike the delegation of other powers by the legislature to local governments, education is not inherently a part of the local self-government of a municipality except insofar as the legislature may choose to make it such. Control of our public school system is a State matter delegated and lodged in the State legislature by the Constitution. The policy of the State has been to retain control of its school system, to be administered throughout the State under State laws by local State agencies organized with plenary powers to carry out the delegated functions given it by the legislature."

In full context, it is apparent that the Court is talking about the distinction between school districts and other municipal corporations, not the distinction between local school districts and the state itself.

*MacQueen v City Commission of City of Port Huron,* 194 Mich 328, 336 (1916) is of similar° import. There the City of Port Huron was held not to have the power to issue its own bonds for school construction.

It is made clear that the school *district* is a separate state agency, not under the control of the local municipality.

"The general school laws were carefully planned and enacted to guard that distinction; provision was made for organization of the common school districts, with officers elected at school meetings by electors with defined qualifications, and who as a school board were given large plenary powers and control of school matters, practically independent from the local government of municipalities in which the schools were situated."

The majority opinion is not good law.

It is not even law at all.

It is a political position paper, written and timed to encourage action by the state Legislature through the threat of future court intervention.

· The majority concede that the question presented is moot. It is against every precept of good constitutional law for a supreme court to decide a constitutional question upon a moot case.

The majority concede that they are not now ordering anyone to do anything.

But this Court graciously offers to entertain a new test of whatever school aid formula the Legislature may adopt in the upcoming session!

It took us five months to decide this case. On that kind of a record, the offer of another lawsuit is hardly generous.

Even worse than the Court's blatant interference with the executive and legislative branches of government is the inept, confusing, and ambiguous nature of its interference.

The Court suggests changing school district boundaries, for example. Even if it were possible to draw districts with equal S.E.V. per pupil—a task to boggle the electronic brain of the best computer —would we not then face an annual redistricting to reflect new stores and homes and factories and changes in pupil enrollment?

Consider another suggestion. *Reduce the ratio* of reliance on property tax.

Almost the whole majority opinion is devoted to belaboring the obvious fact that different school districts have different tax bases behind each pupil.

It then concludes with the novel axiom that whatever is unequal is unconstitutional.

If that be so, then how is it cured by *reducing the ratio* of inequality?

Consider the fuzziness of this pronouncement:

"[E]qual protection * * * may * * * be effectuated by

statewide distribution of all public school funds on an appropriate basis."

And what, pray tell, is *appropriate?*

The conclusion is inescapable that when this Court says *"appropriate",* it means "judicially declared to be appropriate".

How long will the people permit such judicial meddling in the affairs of the state?

How long will the Legislature tolerate such pompous interference with their duties?

And when—

When, in the name of all that is sacred in the administration of justice will the members of this Court turn a deaf ear to the siren call of executive and legislative politics, and come home to the dignity of judicial scholarships, judicial decisions, and judicial restraint?

T. E. BRENNAN, J. *(dissenting).* This action challenges the constitutionality of the method of financing public school education in Michigan.

Similar actions have been filed in other states and in Federal courts.[1] One of these is now pending on appeal to the United States Supreme Court,

---

[1] Those courts having reached a result are: *Serrano v Priest,* 5 Cal 3d 584; 487 P2d 1241; 96 Cal Rptr 601 (1971); *Robinson v Cahill,* 118 NJ Super 223; 287 A2d 187 (1972); *Spano v Board of Education of Lakeland Central School Dist #1, Town of Yorktown,* 68 Misc 2d 804; 328 NYS2d 229 (1972); *Hollins v Shofstall* (Arizona Superior Court for Maricopa County, 1972); *McInnis v Shapiro,* 293 F Supp 327 (ND Ill, 1969), aff'd mem *sub nom, McInnis v Ogilvie,* 394 US 322; 89 S Ct 1197; 22 L Ed 2d 308 (1969); *Burruss v Wilkerson,* 310 F Supp 572 (WD Va, 1969), aff'd mem, 397 US 44; 90 S Ct 812; 25 L Ed 2d 37 (1970); *Hargrave v Kirk,* 313 F Supp 944 (MD Fla, 1970); *Askew v Hargrave,* 401 US 476; 91 S Ct 856; 28 L Ed 2d 196 (1971), vacating judgment and remanding *Hargrave v Kirk; Van Dusartz v Hatfield,* 334 F Supp 870 (D Minn, 1971); *Rodriguez v San Antonio Independent School Dist,* 337 F Supp 280 (WD Tex, 1971). Additionally, there have been approximately 23 cases filed in 15 states as of January 1972. See "Appendix" 7 Harv Civil Rights L Rev 103, 200 (1972).

which has noted probable jurisdiction.[2] In *Askew v Hargrave,* the United States Supreme Court vacated a District Court's summary declaratory judgment of unconstitutionality of a portion of the Florida school financing system, and remanded for further proceedings, saying:

"Since the manner in which the program operates may be critical in the decision of the equal protection claim, that claim should not be decided without fully developing the factual record at a hearing." *Askew v Hargrave,* 401 US 476, 479; 91 S Ct 856, 858; 28 L Ed 2d 196, 199 (1971).

In the case at bar, a factual record has been made. Pursuant to our remand to Ingham County Circuit Court, over 20 session days of trial were held, resulting in the introduction of over 100 exhibits and over 50 pages of detailed findings of fact by the trial judge.

In the light of the United States Supreme Court's comment in *Askew,* a full description of the Michigan public school financing system is in order.

## HISTORICAL BACKGROUND

The commitment to education by the people of these peninsulas began even before we were the State of Michigan. Indeed, it preceded the United States of America.

The Northwest Ordinance adopted in 1787 by the Congress under the old Confederation provided:

### *"Article III*

"Religion, morality and knowledge, being necessary

---

[2] *San Antonio Independent School Dist v Rodriguez,* 406 US 966; 92 S Ct 2413; 32 L Ed 2d 665 (1972).

to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."

Michigan was admitted to the Union on January 26, 1837. It became a state pursuant *inter alia* to an act of the United States Congress, adopted June 23, 1836, which provided in part as follows:

"First. That section numbered sixteen in every township of the public lands, and where such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the State for the use of schools." Laws of 1836, p 57; June 23, 1836; 1 MCLA pp 253–254; 1 MSA p 179.

This Act of Congress, and its acceptance by the new State of Michigan, has been described as an irrevocable compact, vesting title to the described lands in the state, and creating a trust for the use of schools. *The Minnesota Mining Co v The National Mining Co,* 11 Mich 186 (1863).

This trust concept was carried forward in Michigan's constitutional law and history.

Our Constitution of 1835 provided in article 10:

"2. The legislature shall encourage, by all suitable means, the promotion of intellectual, scientifical and agricultural improvement. The proceeds of all lands that have been or hereafter may be granted by the United States to this state, for the support of schools, which shall hereafter be sold or disposed of, shall be and remain a perpetual fund; the interest of which, together, with the rents of all such unsold lands, shall be inviolably appropriated to the support of schools throughout the state.

"3. The legislature shall provide for a system of common schools, by which a school shall be kept up and supported in each school district at least three months in every year; and any school district neglecting to keep

up and support such a school, may be deprived of its equal proportion of the interest of the public fund."

Michigan's original scheme of public school financing, adopted in furtherance of constitutional mandate, consisted of four parts. First, every operating school district received its share of the interest of the primary school fund, computed on the number of school age children in the district. Second, the township was required to contribute matching funds. Third, the school district was authorized to levy ad valorum taxes, with specified dollar limitations. Finally, deficiencies were assessed against parents of school children.

The trust fund concept survived in the 1850 and 1908 Michigan Constitutions. The 1850 Constitution added escheats to the fund.[3]

The principal of the trust fund was paid into the state treasury. The Auditor General computed interest upon the fund annually, and notified the Superintendent of Public Instruction. He in turn, advised the Auditor General annually of the amount of the interest apportioned to each county on account of the number of scholars residing therein. The Auditor General thereupon drew a warrant upon the State Treasurer in favor of the several counties. No specific annual appropriation was necessary. The entire process was administrative, and consistent with the theory that the primary school fund was a trust fund, a permanent endowment to support the public schools of the state.

In 1875, however, the Legislature by Act 22, entitled, "AN ACT to provide for the use of the proceeds of the sale of educational lands in defraying the expenses of the State government," expro-

---

[3] Const 1850, art 13, § 3.

priated to the use of the general fund the principal
and interest of the primary school fund.

Thereafter, a gradual change in the role of the
state in financing public school education began to
occur. The primary school fund, having long been
commingled with the state's general fund, and
finally expropriated by the Act of 1875, existed
only on paper. The interest continued to be com-
puted, as though the fund were in existence. Cer-
tain specific taxes were enacted supplementing
this interest fund, and the whole came to be
known as the primary school interest fund.

Unlike the original primary school fund, the
primary school interest fund was not a perpetual,
self-sustaining, self-operating endowment. It was
rather a revolving fund, constantly being depleted
and replenished.

Accordingly, the Constitution of 1908, provided,
art 10, § 1:

"Section 1. All subjects of taxation now contributing
to the primary school interest fund under present laws
shall continue to contribute to that fund, and all taxes
from such subjects shall be first applied in paying the
interest upon the primary school, university and other
educational funds in the order herein named, after
which the surplus of such moneys shall be added to and
become a part of the primary school interest fund."

Section 23 of art 10, Const of 1908, the so-called
sales tax diversion amendment, provided, in part,
as follows:

"Sec. 23. * * * There shall be set aside for the school
districts 2 cents of a state sales tax levy on each dollar
of sales of tangible personal property on the 1946
statutory base (not rate), to be allocated among said
school districts by law. Such taxes so collected shall be
deposited in a special school aid fund and be expendable
only by legislative appropriations for aid to the school

districts and school employees' retirement purposes as shall be provided by law. Said school aid fund shall be separate and distinct from the state general fund."

These later developments in the financing of public schools in Michigan must be considered in the light of the original compact between the State and the United States with respect to the support of education.

The obligation of that compact was once declared to be judicially enforceable.

In *Cooper v Roberts,* 59 US (18 How) 173, 15 L Ed 338 (1855), the Supreme Court described the object of the compact as follows:

"There is, obviously, a definite purpose declared to consecrate the same central section of every township of every State which might be added to the federal system, to the promotion 'of good government and the happiness of mankind,' by the spread of 'religion, morality, and knowledge,' and thus, by a uniformity of local association, to plant in the heart of every community the same sentiments of grateful reverence for the wisdom, forecast, and magnanimous statesmanship of those who framed the institutions for these new States, before the constitution for the old had yet been modelled." p 178.

Further describing the legal effect of the compact, the Court said:

"We agree, that until the survey of the township and the designation of the specific section, the right of the State rests in compact—binding, it is true, the public faith, and dependent for execution upon the political authorities. Courts of justice have no authority to mark out and define the land which shall be subject to the grant. But when the political authorities have performed this duty, the compact has an object, upon which it can attach, and if there is no legal impediment the title of the State becomes a legal title. The *jus ad*

*rem* by the performance of that executive act becomes a *jus in re,* judicial in its nature, and under the cognizance and protection of the judicial authorities, as well as the others." *Cooper v Roberts, supra,* p 179.

In the later case of *Alabama v Schmidt,* 232 US 168, 173–174; 34 S Ct 301, 302; 58 L Ed 555, 558 (1914), the United States Supreme Court, speaking through Mr. Justice Holmes, described the obligation of the compact as being "honorary".

"The gift to the State is absolute, although, no doubt, as said in *Cooper v Roberts,* 18 How 173, 182, 'there is a sacred obligation imposed on its public faith.' But that obligation is honorary like the one discussed in *Conley v Ballinger,* 216 U. S. 84 [30 S Ct 224; 54 L Ed 393 (1910)], and even in honor would not be broken by a sale and substitution of a fund, as in that case; a course, we believe, that has not been uncommon among the States."

## MODERN DEVELOPMENT

The foregoing brief history of Michigan's role in school financing is useful in the interpretation of more recent provisions of constitution and statutory law.

The Constitution of 1963 worked a radical change in the theory of school financing. For the first time, all constitutional acknowledgement of the Federal endowment for schools was eliminated.

No reference was made either to the "perpetual fund" or to the later primary school interest fund.

Substituted were two brief and comprehensive provisions:

"Sec. 2. The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to

religion, creed, race, color or national origin." Const 1963, art 8, § 2.

"Sec. 11. There shall be established a state school aid fund which shall be used exclusively for aid to school districts, higher education and school employees' retirement systems, as provided by law. One-half of all taxes imposed on retailers on taxable sales at retail of tangible personal property, and other tax revenues provided by law, shall be dedicated to this fund. Payments from this fund shall be made in full on a scheduled basis, as provided by law." Const 1963, art 9, § 11.

Pursuant to these constitutional mandates, the Legislature has enacted, and frequently amended, the state school aid law, being MCLA 388.611 *et seq.;* MSA 15.1919(51) *et seq.* That act begins with these words:

"Section 1. There is hereby appropriated from the school aid fund established by section 11 of article 9 of the constitution of the state for the fiscal year ending June 30, 1965, and for each fiscal year thereafter, the sum necessary to fulfill the requirements of this act, with any deficiency to be appropriated from the general fund by the legislature. * * * "

In actual operation, the school aid fund, as established by the constitutional dedication of one-half of all sales tax revenues is insufficient to support the present level of appropriations for state school aid purposes. Supplementation of that fund from the state's general fund accounts for more than one-half of the state school aid.

The executive budget for 1971–1972 estimates a total state appropriation for school aid in the amount of 1,027 millions of dollars. Of that amount, 472.3 million would be from dedicated revenues, including sales tax, cigarette and liquor taxes.

State aid to local school districts is no longer distributed on the simplistic formulae of years gone by. Mathematical equality of distribution on the basis of pupil enrollment, once the hallmark of state aid, has given way to more complex and sophisticated computations, designed to accomplish a variety of state goals in the field of education.

Of particular significance are the provisions of § 3 of the Act, providing for the distribution of 23 million dollars to school districts for the purpose of improving basic cognitive skills of pupils enrolled therein.

As found by the trial court, Michigan Educational Assessment Program measures the basic achievement of students in the 4th and 7th grades throughout the state. Section 3 funds are distributed to the educationally needy, as demonstrated by the test scores. It channels the expenditure of the funds through the State Board of Education to assure that they are expended for effective purposes.

The allocation of § 3 funds is notable because, as found by the trial judge, there is no statistical relationship between the value of taxable property in a given school district and the achievement scores of the students. Therefore, § 3 allocations may, and in many instances do, go to districts which have higher than average property tax bases. But the state purpose in the allotment of § 3 funds is clear, and can hardly be considered a deprivation of equal protection of the laws.

Other so-called categorical funds are included in the state school aid laws to assist in payment for transportation, vocational programs and the like. As in the case of § 3 funds, these appropriations are directed toward specific legislative objectives. They operate equally with respect to all districts

falling within the measure of their standards, and do not deny equal protection of the laws.

## SECTION 8a APPROPRIATIONS

The heart of the state school aid program, in terms of dollars distributed to local school districts, is § 8a of the Act, being MCLA 388.618a; MSA 15.1919 (58a). It provides as follows:[4]

"Sec. 8a. (1) To every district in the state, except as otherwise provided in this act, there shall be appropriated where required to meet the provisions of this act, a sum determined as provided in subsection (2) plus the amount allocated for tuition and transportation. No school district shall receive a smaller net allowance per membership pupil for 1971–72 than was received by the district in 1970–71 after reductions made by executive order except that no more than $10,000,000.00 shall be distributed under this provision. The apportionment of the school aid fund to the several school districts shall be governed and limited by the provisions of section 35. Whenever 2 or more districts are reorganized into a single district, either through a procedure of annexation or consolidation, the amount of state aid to be received by such new district during the 2 years immediately subsequent to the annexation or consolidation shall not be less than the total sum of state aid which was earned by all of the districts forming the new

---

[4] 1972 PA, No 258, amends this section to read as follows:

"Sec. 21. (1) Except as otherwise provided in this act, from the amount appropriated in section 11 there is allocated to every district a sum determined as provided in subsection (2) plus the amounts allocated for transportation in chapter 7 and tuition in chapter 11.

"(2) The sum allocated to each school district shall be computed from the following table:

| "State equalized valuation behind each child | Gross Allowance | Deductible Millage |
|---|---|---|
| "(a) $17,750.00 or more | $644.00 | 16 |
| "(b) Less than $17,750.00 | $715.00 | 20" |

district during the last fiscal year in which the districts received aid as separate districts.

"(2) The sum allocated to each school district shall be computed from the following table:

| "State equalized valuation behind each child | Gross Allowance | Deductible Millage |
|---|---|---|
| (a) $17,000.00 or more | $559.50 | 14 |
| (b) Less than $17,000.00 | $661.50 | 20" |

The effect of this provision is to distribute state aid in an inverse ratio to the ability of the local school district to produce revenue through ad valorem property taxes in the district. Thus a district with more than $40,000 in state equalized valuation of taxable property behind each student would receive nothing from the state by virtue of subsection (2). A district with $39,000 of such property would receive $13.50 for each student. The state aid per pupil increases at the rate of $14 for each decrease of $1,000 in taxable property per student, until the level of $17,000 of state equalized valuation is reached. Thereafter, the increment becomes $20 per thousand. The school district with the lowest ratio of taxable property to student enrollment would receive in excess of $600 per pupil in state aid.

It can be seen that the § 8a funds are not equally distributed in terms of dollars per student. Neither are they equally distributed in terms of a single flat rate based upon the state equalized valuation of taxable property behind each student. The net effect is rather a two-stage graduated rate which favors districts having the least local taxing capacity.

In addition to the formula described in subsection (2) of § 8a, there is provision in subsection (1) for the distribution of 10 million dollars under the so-called membership guarantee or grandfather

clause.[5] This provision has been retained in the
Act through the various amendments ever since
the revision of Act 221 of PA 1962 increased
deductible millage from 3-1/4 mills to 3-7/8 mills,
and increased the gross allowance from $205 per
student to $224 per student.

Every increase in the gross allowance benefits
all school districts equally. Every increase in the
deductible millage works to the disadvantage of
the districts with higher state equalized valuation
per pupil.

Since 1959, the gross allowance has been in-
creased about 350% and the deductible millage
has been increased about 600%.

The net effect of the several amendments has
been to increase the proportion of state school aid
funds distributed to districts with lower valued
taxable property.

Several other sections of the state school aid law
deserve mention. Section 31 deprives a school
district of all aid if school is not taught therein for
9 months of the year. Section 17 provides an
appropriation of $20,000,000 to compensate for so-
called municipal overburden, according to a for-
mula which takes into account the demands of
other governmental services upon the taxable
property in the district. Section 35 deprives a
district of a proportional share of state aid if local
taxation is not levied at a rate of 10 mills or
more.[6]

## LOCAL TAX COMPONENT

Almost half of the cost of public school educa-
tion in Michigan is derived from local ad valorem

---

[5] The grandfather clause has been eliminated in 1972 PA 258.

[6] Amended by 1972 PA 7 to 9 mills.—REPORTER.

taxes. It is customary to express such taxes in terms of mills. A mill is one-tenth of one percent of the state equalized assessed valuation of real and personal property. Millage emanates from two sources. "Non-voted" millage is annually allocated by the county allocation board or permanently allocated by vote of the people within constitutional limits of 15 and 18 mills respectively.

"Voted" millage is millage over and above the constitutional limitation and is levied from time to time by vote of the electors—taxpaying and non-taxpaying—in the school district.

The number of dollars per student resulting from the levy of local ad valorem taxes depends on the rate of tax (millage) and the state equalized value of taxable property in the district. (S.E.V.)

No finding was made by the trial court as to the median income of families living in the several school districts. Michigan is an economically mixed state, having both industrial and rural areas.

Some school districts, having high ratios of S.E.V. to school enrollment, have high concentrations of industrial and commercial properties. Other districts have little or no industry, and are often called bedroom communities. The defendant City of Dearborn is an example of the former, and the defendants Bloomfield Hills and Grosse Pointe are examples of the latter.

S.E.V. is usually a measure of the wealth of the district, but not truly a measure of the wealth of the people who live in the district. Thus the City of River Rouge enjoys one of the highest S.E.V. per pupil ratios, but ranks in the lower range of socio-economic status as measured by the State Board of Education.

Typically, minority students live in industrial

areas, where S.E.V. ratios are high. The lower
S.E.V. districts in Michigan are typically in rural
areas where concentrations of minority students
are lowest.

The state-wide average millage levy is approxi-
mately 25 mills. Because of the difference between
the average millage levy in the several school
districts and the deductible millage contained in
the state school aid formula, there is a disparity
among the districts in the amount of revenue per
pupil available to the various school districts.

In recent years, Michigan communities have
experienced a hardening of opposition to school
millage proposals. New millage has often been
rejected by the electors, and in some districts,
voters have refused even to renew existing millage
levels.

Should millage levels fall below the deductible
millage provision, state aid would have the effect
of substantially equalizing revenues available to
higher and lower S.E.V. districts, up to the
amount of the gross allowance provided in the
state school aid act.

Even so, there would remain a disparity between
high and low S.E.V. districts in terms of local
capacity to provide educational programs exceed-
ing the cost level of the statutory gross allowance.

. In addition, the disposition of local voters, the
vicissitudes of the local market for teachers and
school personnel, and the environmental cost fac-
tors in various parts of the state all contribute to
effect differences in the cost of education from one
area of Michigan to another.

## LOCAL EDUCATIONAL PURPOSE

The trial court made no finding of fact as to the

purpose of education. Nor could he have done so. Experts in education are not agreed. Courts are not agreed. People are not in agreement.

In Michigan, we have a constitutionally stated purpose in educating our children. "Religion, morality and knowledge * * * ." Const 1963, art 8, § 1.

But the First Amendment has been interpreted as prohibiting the teaching of religion in schools. Likewise, morality is questioned in many quarters as being a species of religious doctrine, and where it is assented to in principle, it is debated in specifics.

Only knowledge remains. Yet even here, there is no agreement as to content. What knowledge is important? Which is necessary to good government and the happiness of mankind?

Some answer, the three "R's", Reading, 'riting and 'rithmetic. Some answer, the three "S's", Science, Sociology and Sensitivity.

Education stems from the Latin root meaning to "lead out". Every leading out of a child from the limitations of his infancy necessarily involves value judgments of subject matter, of presentation, of attitude.

There is no such thing as valueless, antiseptic, sterlized education. Even the vaguest pluralist goal of exposing a child to the broadest possible learning experience is itself a very specific educational objective and one far from devoid of shortcomings or beyond criticism.

No statement of the purpose of public education could be less consonant with the free history and liberal tradition of Michigan than that of the Court in *Serrano v Priest,* 5 Cal 3d 584, 610; 487 P2d 1241, 1259; 96 Cal Rptr 601, 619 (1971):

"[P]ublic education actively attempts to shape a child's personal development in a manner chosen not by the child or his parents but by the state."

A child is not the creature of the state. A child's first allegiance is to his family and parental rights and responsibilities in the education of children come before the state's. *Pierce v Society of Sisters,* 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925); *Wisconsin v Yoder,* 406 US 205, 92 S Ct 1526, 32 L Ed 2d 15 (1972).

Public education is not government education. The two are as distinct as public opinion and government policy.

Public schools are surely subject to reasonable regulation by the state just as they are entitled to support and encouragement from the state. But they do not spring from state laws nor exist to serve state policies and purposes.

Public schools are established by the people in their local communities. They exist primarily to fulfill the *parental* responsibility of educating children.

It is for the people of each district to write their own definition of quality education through the implementation of such programs, the encouragement of such skills, and the exposure to such values as they deem appropriate and needful.

Through locally elected school officials, locally adopted taxation and locally determined school policies, the public educate their children in public schools. We are not a single homogeneous public. We are a plural society. The aims and aspirations of the people in one community differ from those in another.

One school may offer classical guitar lessons and college level mathematics. Another may emphasize vocational training or animal husbandry. The

needs of the public in the local community are to be met by their public school. The costs are not the same.

Quality education is not a function of the wealth of a community. It is a function of achieving the goals and fulfilling the educational aspirations of the people who live in the school district, and who in a collective sense, own and operate the public school.

Some school districts with low S.E.V. ratios are very proud of the education they provide. The public is satisfied. The public school provides a quality education.

Other school districts with high S.E.V. ratios are troubled with citizen discontent. The quality of education is unsatisfactory despite considerable resources.

The truth of the primacy of the role of the family in the education of children is only lately being rediscovered. Studies made in our Michigan public schools, placed in evidence in the hearing of this matter, demonstrate that the only factor which bears a significant statistical correlation to cognitive achievement is socio-economic status of the students' families.

But cognitive achievement itself is only one measure of education. A low dropout rate is another. A low unemployment rate among graduates is another.

Less susceptible of exact measurement, but equally important are the intangible factors. Good sportsmanship, Brotherhood, Courtesy, Loyalty, Integrity, these are all proper objects of the parental educational mission.

And since the public school is primarily a cooperative extension of the familial responsibility to the education of children, the success of the school

will be measured in the same terms as the success of the parents.

A law abiding semi-literate taxpayer may indeed be a greater credit to his family and his school than a highly articulate rapist.

The distinction between public education and other municipal functions and concerns, relied upon in *Serrano, supra,* is more rhetorical than logical or legal.

Every local unit of government has a different tax base. Every community in Michigan has a different state equalized valuation of taxable property behind each policeman, fireman, elected official and municipal employee.

Indeed, every county has a different tax base standing behind each lawyer appointed to represent an indigent defendant. The fundamental nature of that expenditure of tax dollars is hardly open to dispute. And yet we have not said that the representation of indigents is a function of the wealth of the community.

And if education is to be distinguished from other municipal concerns, an argument can be made that public education is too fundamental, in terms of its impact on children and its need to be sensitive to local values, to be operated as a single, state-wide amalgam.

Support of local schools by local taxation is a principle qualitatively different from the bare concept of local control.

It is the difference between delegated, agency decision-making and proprietary interest and authority.

The right of the people in a school district to operate local public schools for the purpose of fulfilling locally defined goals is the moral consequence of their own millage elections. It is not a

privilege extended by sufferance of the state or delegated by reason of administrative expediency perceived by state officials.

## PRECEDENTS AND TRENDS

At the outset of this opinion, reference was made to several actions in state and Federal courts, both decided and pending.

Our duty as judicial officers requires obedience to the mandate of the United States Supreme Court in all matters of interpretation and application of Federal constitutional standards.

Discussion of some of those cases is in order.

The first of these is *McInnis v Shapiro,* 293 F Supp 327 (ND Ill, 1968). Decided by a three-judge panel in the Federal district court for the Northern District of Illinois in November of 1968, *McInnis* was the earliest of the school financing cases.

There, the court held that the Illinois school financing system, comprised in part of local real property taxation was not in conflict with the due process or equal protection provisions of the Federal Constitution.

In March of 1969, the Supreme Court of the United States affirmed the district court in *McInnis v Ogilvie,* 394 US 322; 89 S Ct 1197; 22 L Ed 2d 308, in a per curiam, memorandum opinion. Mr. Justice Douglas felt that probable jurisdiction should have been noted.

In May of 1969, *Burruss v Wilkerson,* 310 F Supp 572 (WD Va, 1969), was decided by a three-judge panel in the United States district court for the Western District of Virginia. That court cited *McInnis* and came to the same conclusion.

In February of 1970, *Burruss* also reached the United States Supreme Court, *aff'd* mem, 397 US

44; 90 S Ct 812; 25 L Ed 2d 37 (1970), with same per curiam result as *McInnis.* This time, Mr. Justice Douglas and Mr. Justice White favored noting probable jurisdiction.

Thereafter, in September of 1970, the California Court of Appeals in *Serrano v Priest,* 10 Cal App 3d 1110; 89 Cal Rptr 345, similarly held that no cause for constitutional complaint was stated, citing *McInnis.*

In August of 1971, the Supreme Court of California decided *Serrano v Priest,* 5 Cal 3d 584, 617; 487 P2d 1241, 1265; 96 Cal Rptr 601, 625, for the first time holding that the equal protection guarantee of the United States Constitution invalidated the California school financing system, insofar as the same relied upon local property taxation.

The *Serrano Court* distinguished *McInnis* in this way,

"the *McInnis* plaintiffs repeatedly emphasized 'educational needs' as the proper standard for measuring school financing against the equal protection clause.
* * * "

and then concluded,

"in fact, the nonjusticiability of the 'educational needs' standard was the basis for the *McInnis* holding; the district court's additional treatment of the substantive issues was pure dictum."

The *Serrano* view of *McInnis* was inaccurate. It was not the *McInnis* plaintiffs who emphasized "educational needs," but the *McInnis* court which thus characterized the thrust of the plaintiffs' argument.

"The underlying rationale of the complaint is that *only* a financing system which apportions public funds

according to the educational needs of the students satisfies the Fourteenth Amendment." *McInnis v Shapiro, supra,* p 331.

In truth, the *McInnis* plaintiffs made almost the identical argument as the *Serrano* plaintiffs. That argument was considered and decided by the *McInnis* court, not as dictum, but as the controlling reason for decision.

Thus,

"Moreover, under the equal protection clause, the students contend that the importance of education to the welfare of individuals and the nation requires the courts to invalidate the legislation if potential, alternative statutes incorporating the desirable aspects of the present system can also achieve substantially equal per pupil expenditures.[13]

\* \* \*

"[13] Thus, the students advocate a doctrine similar to the close scrutiny given laws which infringe First Amendment rights. See, e.g., Kevishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)." *McInnis v Shapiro, supra,* p 331.

The *McInnis* plaintiffs, like those in *Serrano,* relied upon *Brown v Board of Education,* 347 US 483; 74 S Ct 686; 98 L Ed 873 (1954), *Douglas v California,* 372 US 353; 83 S Ct 814; 9 L Ed 2d 811 (1963), and *Reynolds v Sims,* 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964), but the court in *McInnis* concluded,

"But the plaintiffs' conclusion does not follow so readily from the preceding building blocks." *McInnis v Shapiro, supra,* p 334.

Moreover, the *Serrano* Court found it necessary to disregard the apparent mandate of the United States Supreme Court in both the *McInnis* and

*Burruss* per curiam affirmances. It concluded that such affirmances were not really affirmances because made without oral argument or citation of case precedent.

The first Federal court to come to a result opposite from *McInnis* was the district court for Minnesota in *Van Dusartz v Hatfield,* 334 F Supp 870 (D Minn, 1971). No three-judge panel was convened in *Van Dusartz.* The reported decision of the district judge was a memorandum and order upon motion to dismiss in the nature of demurrer.

Because of the procedural posture of the case, the district judge was presented with the necessity of assuming certain allegations to be true for the purpose of deciding the motion to dismiss. One of those uncontroverted assumptions was:

"The districts having the lowest per-pupil expenditure, which are generally the poorest districts in terms of assessed valuation per-pupil unit, offer an education that is inferior to the districts having the highest per-pupil expenditures." *Van Dusartz v Hatfield, supra,* p 874.

In *Van Dusartz,* the district judge subscribed to the reasoning of *Serrano,* that education is a fundamental interest; that the Minnesota school financing system made the quality of education a function of wealth; that wealth is a suspect classification; that where a fundamental right is denied on the basis of a suspect classification, the state must demonstrate a compelling interest in the classification, and that no such compelling interest was demonstrated in view of suggested alternatives.

The *Van Dusartz* court was not faced with the problem of remedy. The case has since been dismissed.

The same line of reasoning was followed two months later by a three-judge panel of the district court for the Western District of Texas in *Rodriguez v San Antonio Independent School Dist,* 337 F Supp 280 (WD Tex, 1971).

Unlike *Van Dusartz, Rodriguez* was a judgment based upon a full factual hearing. While the Texas school financing laws bear much resemblance to our own, the facts found in that case are in many respects different from the facts found by the trial judge in the case at bar.

The *Rodriguez* court observed that median family income in the several school districts was proved at the trial. It pointed to expert testimony to the effect that the system tends to subsidize the rich at the expense of the poor. It concluded that the "rich" districts had 8% minority pupils, and the "poor" districts were 79% minority.

In *Rodriguez,* the court assumes without discussion that the amount of money spent on schools is the measure of the quality of education provided, and then concludes:

"Having determined that the current system of financing public education in Texas discriminates on the basis of wealth by permitting citizens of affluent districts to provide a higher quality education for their children, while paying lower taxes, * * * ." p 285.

In our case, there is no evidence of median family income; no suggestion of racial or minority discrimination; no factual basis to conclude that rich people are subsidized by poor people in the educational system. Quite to the contrary, exhibits introduced at trial show that many of Michigan's richest school districts are in industrial and commercial areas where resident income is modest.

Furthermore, unlike the *Rodriguez* court, this

Court may not assume a direct relationship between "quality" of education and tax base. Evidence was produced at the hearing of this cause which tended to prove that no such relationship existed, and there was no affirmative finding to the contrary.

Finally, the *Rodriguez* court avoided the problem of judicially manageable standards and judicial remedy by staying its mandate for two years. Its conclusion then is hardly more forceful than the fond hope expressed by the *Burruss* court that the Legislature would act to improve the system.

In *January* of 1972, *Spano v Board of Education of Lakeland Central School Dist #1, Town of Yorktown,* 68 Misc 2d 804; 328 NYS2d 229 (1972), was decided. The work of a single state *nisi prius* judge, *Spano* is notable mostly for its acid disagreement with the *Serrano* Court's distinguishment of *McInnis* and *Burruss. Spano* concludes that the United States Supreme Court has spoken via its per curiam affirmance in those two cases, and the matter is settled.

Subsequently, of course, that august body has noted probable jurisdiction in *Rodriguez.* Whether that fact portends reversal or affirmance is not for us to speculate.

One last case deserves mention, for it represents a slightly different aspect of the school financing problem.

In May of 1970, a three-judge panel in the United States district court for the Middle District of Florida in *Hargrave v Kirk,* 313 F Supp 944 (MD Fla, 1970), held the Florida Millage Rollback Law to be unconstitutional. The Millage Rollback Law denied state aid to any district which levied more than 10 mills of ad valorem property taxes, even on vote of the people. The court in effect held

the people in the districts had a right to tax themselves.

The court pointed out,

"The Florida Act *prevents* the *local Boards* from adequately financing their children's education. The complaint is not that the state *permits* the Boards to spend less, but that it *requires* them to spend less. Plaintiffs are asking to be able to *raise* more money *locally.* In *McInnis* the plaintiffs wanted the *state* to *give* them more. Irrespective of the plaintiffs' successful attack on the Act, we know that there will continue to be disparities in per pupil expenditures in Florida, either because some counties may not desire to spend as much as other counties on the education of their children, or because, in the poorer counties, they cannot. Plaintiffs do not contest the variations in per pupil expenditures from these causes, but only 'the unequal impediment placed on us by the state because we are poor.' We consider this to be a fundamental distinction between the cases." *Hargrave v Kirk, supra,* p 949.

The United States Supreme Court vacated and remanded *Hargrave* on two grounds. *Askew v Hargrave,* 401 US 476; 91 S Ct 856; 28 L Ed 2d 196 (1971). First, that the case was a proper one for Federal judicial abstention, and second, that the pleadings and affidavit were inadequate as a basis for deciding the equal protection claim.

*Askew* is of little help, except as it may demonstrate a disposition in Washington to proceed with caution in the area of invalidating state school financing systems.

In my opinion, the Michigan public school financing system has not been demonstrated to constitute a denial of equal protection of the laws under the state or Federal Constitution. I would dismiss the action, without costs.

BLACK, J., concurred with T. E. BRENNAN, J.

T. G. Kavanagh, J. *(concurring in dismissal).* I concur in the result reached by my Brother Brennan, because as much as I deplore the acknowledged disparate educational opportunities offered among the state established districts, I am persuaded the Legislature is not constitutionally forbidden to ordain so.